39924. McINTYRE v. ZAC-LAC PAINT & LACQUER CORPORATION.

DECIDED APRIL 29, 1963—REHEARING DENIED MAY 23, 1963.

*Wilson Brooks, Philip T. Keen,* for plaintiff in error.
*Noah J. Stone, Hugh W. Stone,* contra.

EBERHARDT, Judge. ■ Defendant in error urges that since plaintiff in error recites in the bill of exceptions that he "then and there *accepted* and herein now [sic] *accepts* and assigns the same as error" there is no assignment of error and nothing for this court to consider. He urges that this position finds further support in the recital in the brief of plaintiff in error that "plaintiff in the lower court then *accepted* and now *accepts*" to the judgment sustaining the general demurrer.

The language of this assignment of error in the bill of exceptions and the recital in the brief are, of course, incorrect and inept. The word "accept" means to receive with favor, to assent or agree to, to embrace, to adopt. Obviously this is not the position with reference to the judgment that plaintiff in error wishes to take or assume. Rather, he "excepts" to or disagrees with and disaffirms it, or wishes to do so, for he proceeds in the assignment to say that he "assigns the same as error upon the ground that it was contrary to law and says that the court erred in sustaining said general demurrer and in not overruling said demurrer and holding that plaintiff's petition set forth a cause of action." Thereby he explains and makes known his true position in the matter. The nature of law and the practice of law is such that counsel should be more careful and precise in the matter of semantics. The meaning and effect of a will, a contract or a pleading is to be ascertained and determined by the language employed in its preparation. It is the lawyer's responsibility to his client to select and employ words in the construction of these documents that will accurately convey the meaning intended.[1]

----

[1]See, Gormley, Lawyers Must Be Effective Communicators,

Though acute today the problem is not new, nor has it been confined to the legal profession. It will be recalled that when Hamlet came into the presence of Polonius reading and was asked "What do you read, my lord?" he answered, "Words, words, words."[2] And Jack Cade, the rebel, speaking to Lord Say charged: "Thou hast most traitorously corrupted the youth of the realm in erecting a grammar school: and whereas, before, our forefathers had no other books but the score and the tally, thou hast caused printing to be used, and, contrary to the king, his crown and dignity, thou hast built a paper-mill. It will be proved to thy face that thou hast men about thee that usually talk of a noun and a verb, and such abominable words as no Christian ear can endure to hear."[3]

That this court has been unwilling to penalize for ineptitude when the true intent can be ascertained is demonstrated in *Murrow v. Walden*, 31 Ga. App. 163 (120 SE 545), where it was stated that "The motion to dismiss the writ of error was on the ground that the words 'accepted' and 'accepts' appear in the bill of exceptions where the words 'excepted' and 'excepts' should appear. They are followed by assignments of error in the usual form." The motion was denied. In *Kerr v. Holder*, 13 Ga. App. 9 (1) (78 SE 682) a motion to dismiss on the ground that

47 A.B.A.J. 572 (June, 1961); McGowan, Lawyers and the Uses of Language, Id. at 897 (Sept., 1961); Rossman, The Lawyers' English, 48 A.B.A.J. 50 (Jan., 1962); Jackson, A Philological Lesson, Id. at 804 (Sept., 1962); Rossman, Better English for Lawyers as Draftsmen and Advocates, Id. at 1048 (Nov., 1962); Miller, Some Remarks on Legal Writing, 18 Ga. B. J. 253 (1956); Smith, Some Confessions of a Bar Examiner, 21 Ga. B. J. 333 (1959) (bar examination illustrations of language substitutions); Probert, Law and Persuasion: The Language-Behavior of Lawyers, 108 U. Pa. L. Rev. 35 (1959); Probert, Language of Law, a Symposium, 9 West. Res. L. Rev. 115 (1958); Probert, Why not Teach Semantics in Law School? 10 J. Legal Ed. 208 (1957); Hardy, Words for Lawyers, 27 Miss. L. J. 197 (1956); Almand, Law, Language and Literature, 14 Mer. L. R. 372 (1963).

[2] Hamlet, Act II, Sc. 2.
[3] II Henry VI, Act IV, Sc. 7.

the judge had certified the bill of exceptions to be "due" instead of "true" was denied. More recently in *Hicks v. M. H. A., Inc.*, 107 Ga. App. 290 (1) (129 SE2d 817) we declined to dismiss where the assignment of error recited that the general demurrer had been overruled when other portions of the assignment and the record showed that it had been sustained. In *Thompson v. Simmons & Co.*, 139 Ga. 845 (3) (78 SE 419) the Supreme Court declined to dismiss on the ground that it was recited in the bill of exceptions that "the defendant excepted and now excepts," when it was apparent from the whole bill of exceptions that the word "defendant" had been inadvertently used for "plaintiff." Judge Russell, later Chief Judge and afterward Chief Justice of the Supreme Court, in *American Investment Co. v. Cable Co.*, 4 Ga. App. 106, 108 (60 SE 1037) stated the position of this court when he said: "The main purpose of the creation of courts for the correction of errors is to have the questions which are presented in the litigation definitely decided. It is the settled policy of this State, as shown by several recent acts of the General Assembly, that the legal merits of every case shall be passed upon by the court of last resort, and not only that, but furthermore that the pathway to justice shall not be made difficult by technicalities."

■ Let us now proceed to a determination of whether the demurrer was properly sustained. On the premise that all people who are capable of contracting shall be extended the full freedom of doing so if they do not in some manner violate the public policy of this State,[4] both the Supreme Court and this court

---

[4]"[I]f there is one thing which more than another public policy requires, it is that men of full age and of competent understanding, shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be held sacred, and shall be enforced by the courts of justice. Therefore you have this paramount public policy to consider— that you are not lightly to interfere with this freedom of contract." From the opinion of Sir George Jessel, M. R., in Printing & N. Registering Co. v. Sampson, L. R. 19 Eq. 465, quoted with approval by Judge Gilbert in *Mutual Life Ins. Co. v. Durden*, 9 Ga. App. 797, 800 (72 SE 295). "It is well settled that con-

have held that if a party to a contract contemporaneously gives the other a covenant not to sue he is bound by it. *Martin v. Monroe,* 107 Ga. 330 (3) (33 SE 62); *Arnold v. Johnston,* 84 Ga. App. 138 (65 SE2d 707); *Jones v. Darling,* 94 Ga. App. 641 (95 SE2d 709). Recognizing this principle but holding that it is not applicable if the covenant rests in parol are *Crooker v. Hamilton,* 3 Ga. App. 190 (2) (59 SE 722); *Sasser v. McGovern,* 11 Ga. App. 88, 89 (74 SE 797) and *Tennille Banking Co. v. Ward,* 29 Ga. App. 660 (2) (116 SE 347). And even a written covenant made subsequently to the original undertaking must be founded upon a new consideration. *Martin v. Monroe,* 107 Ga. 330, 333, supra.

But what of the covenant here? Is it severable so that it has application to one part only of the contract, or does it apply to the whole? Provision is made for two kinds of compensation— a definite fixed salary for the period of a year and a bonus in an unspecified amount. As to the salary, provision is made in paragraph 7 that in the event of its termination, "whether by death of E. Fred McIntyre, Jr., or by mutual agreement, or otherwise, said E. Fred McIntyre shall be entitled to receive the proportionate amount of his stipulated salary then due, computed on a monthly basis." Nothing is provided in this paragraph concerning the bonus.

But in paragraph 8 provision is made. "It is also agreed that the provisions made herein, including bonus arrangement, are voluntary and no suit or action shall be brought against Zac-Lac Paint & Lacquer Co. to recover same," and further, "in the event E. Fred McIntyre, Jr. severs his connection with the corporation before the close of any fiscal year, that he will not be entitled to receive any sums provided for herein."

Paragraph 8 is ambiguous, for a literal construction of it may afford application of the covenant both to the salary and the bonus arrangements. It refers to the "provisions made herein,

---

tracts will not be avoided by the courts as against public policy, except 'where the case is free from doubt and where an injury to the public interest clearly appears.'" *Phenix Ins. Co. v. Clay,* 101 Ga. 331 (28 SE 853, 65 ASR 307).

including bonus arrangement" as being voluntary. If it refers both to salary and bonus this can not be, for the salary provision is fixed, definite and certain. It is mutual and in no sense voluntary.

Then what is the proper construction of paragraph 8? As an aid and guide let us first turn to the provisions of *Code* § 20-704 (6): "The rules of grammatical construction usually govern, but to effectuate the intention they may be disregarded; sentences and words may be transposed, and conjunctions substituted for each other. In extreme cases of ambiguity, where the instrument as it stands is without meaning, words may be supplied." More than 85 years ago the Supreme Court announced that "The fundamental rule, the rule which swallows up almost all others in construing a paper, is to give it that meaning which will best carry into effect the intent of the parties. This is the object of rules of interpretation, to discover the true intent of the parties, and in doing this we are to take the whole of [the instrument] together, and to consider this with the surrounding circumstances." *Shorter v. Methvin,* 52 Ga. 225 (1), 230.

The overall purpose of the contract here, as we see it, was to provide to Zac-Lac an administrative assistant to its president and to McIntyre a job for 12 months at a monthly salary of $1,000 and to provide to him an unspecified bonus from the corporate profits. The corporation was to be bound for the salary, but the bonus was to be a gratuity. In Webster's Dictionary a bonus is defined as "money, or an equivalent, given in addition to an agreed compensation." So it was to be here. We do not think that it was the intention of the parties to agree that, without just cause, the rug might literally be pulled from under the employee in the middle of the contract term and that he should have no recourse, nor do we ascribe to the employer any purpose to overreach its employee.

It has oft been said that "hard cases make bad law," and this may be no exception, for it is a hard case. Oftener, perhaps, poorly worded or drawn contracts make bad law. Here again we see the importance of good and careful draftsmanship. If it be held here that the covenant in paragraph 8 applies both to the salary and the bonus arrangements it must follow that the

plaintiff has no right of action. Indeed if payment had not been made of the salary during the five months that McIntyre worked and performed services under the contract the literal interpretation would bar any suit even for the salary earned. But in the light of the overall purpose of the contract we are reluctant to hold that the parties so intended it or that it ought to be so construed. "Where the purpose of the contract would be defeated by one interpretation but given effect by another, the meaning ascribed to the ambiguous clause will be that which gives effect to the main apparent purpose of the contract." *Wright v. Piedmont Eng. &c. Corp.*, 106 Ga. App. 401 (2) (126 SE2d 865).

A key in ascertaining the true intention of the parties relating to the salary feature of the contract is found in the sentence in paragraph 1 which reads: "This contract *shall* remain in force *except* for the failure to perform satisfactorily the duties outlined herein." (Emphasis supplied). This sentence immediately follows the provision that the employment is for a period of one year and the provision setting forth the salary and method of payment.

If this language means what it clearly says, then both parties intended to be legally bound by the one-year term of employment and the salary provisions as set forth in that paragraph, the only exception being the failure of the plaintiff-employee satisfactorily to perform his duties.

How then do we arrive at a reasonable, logical and fair interpretation of the covenant? In Webster's unabridged dictionary we find that the word "including" may mean, *inter alia*, "embracing," and that a synonym therefor is "comprising." Taking that meaning and substituting it we have: "It is also agreed that the provisions made herein, comprising [the] bonus arrangement, are voluntary and no suit or action shall be brought" to recover the same. However, it may be urged that since the phrase "including bonus arrangement," or even "comprising [the] bonus arrangement," is set off by commas it must of necessity follow that the covenant is not limited to it. If we were bound by the rules of grammar in trying to reach an interpretation of this covenant that contention might have basis. But

814

since we deal with ambiguity we are not bound. "It might be possible for a case to arise in which all other considerations were evenly balanced and that the difference between these marks of punctuation[5] might, like a feather's weight, turn the scale to one side rather than the other; but this is not a case of that character. 'The punctuation of an instrument may be considered when the meaning is doubtful, but it can not control if the meaning otherwise plainly appears. In order to arrive at the meaning of the parties, proper punctuation marks may be inserted by the court in construing the instrument.' 17 Amer. & Eng. Ency. Law 20; 13 C.J. 535, § 494 (b), and citations. In Holmes v. Phoenix Ins. Co., 98 Fed. 240 (2), 47 LRA 308, the United States Circuit Court of Appeals said: 'Punctuation is no part of the English language. The Supreme Court says that it 'is a most fallible guide by which to interpret a writing.' Ewing v. Burnet, 11 Pet. 41, 54 (9th L. Ed. 624). The Century Dictionary tells us, what is common knowledge, that 'there is still much uncertainty and arbitrariness in punctuation.' It is always subordinate to the text, and is never allowed to control its meaning. The court will take the contract by its four corners, and determine its meaning from its language, and, having ascertained from the arrangement of its words what its meaning is, will construe it accordingly, without regard to the punctuation marks, or the want of them. The sense of a contract is gathered from its words and their relation to each other, and after that has been done, punctuation may be used to more readily point out the division in the sentences and parts of sentences. But the words control the punctuation marks, and not the punctuation marks the words." *Bridges v. Home Guano Co.,* 33 Ga. App. 305, 310 (125 SE 872).

Now again applying the dictionary meaning of "including" and omitting the commas we have the covenant reading: "It is also agreed that the provisions herein made comprising [the] bonus arrangement are voluntary and no suit or action shall be brought" to recover the same. The true intent of the parties, consistent with the overall purpose of the contract, thus becomes

---

[5]Comma and semicolon.

clear. But, without the substitution of the dictionary meaning, if we simply take the commas out we have: "It is also agreed that the provisions herein made including bonus arrangement are voluntary and no suit or action shall be brought" to recover the same. Again it is clear that the covenant is limited to the *provisions which include in the contract provision for a bonus.* Resort to the dictionary for the meaning of "including" becomes unnecessary.

The covenant would bar any action seeking to recover the bonus, but no recovery of that is sought here. Plaintiff declares on the obligation of the employer to pay salary. The covenant does not bar that, and the sustaining of the demurrers was error.

*Judgment reversed. All the judges concur as to Division 1 of the opinion. Carlisle, P. J., Bell, Hall and Russell, JJ., dissent as to Division 2.*

RUSSELL, Judge, Dissenting. I disagree with the ruling in Division 2 only. "Courts do not make contracts for parties, but enforce such legal contracts as parties make, when called on so to do." *Strickler & Co. v. Tinkham,* 35 Ga. 176, 180. "It is unquestionably the duty of courts to enforce contracts and protect the rights of parties arising from them. Upon sufficient legal or equitable grounds, they may also relieve parties from them; but they have no power to make them for parties, and, when deliberately made, to modify or change them in any material respect." *Tumlin v. Vanhorn,* 77 Ga. 315, 320 (3 SE 264). See also *Delaware Ins. Co. v. Pennsylvania Fire Ins. Co.,* 126 Ga. 380, 385 (55 SE 330, 7 AC 1134).

A contract containing an obligation to perform and a covenant not to sue at the same time requires enforcement of the covenant not to sue. *Martin v. Monroe,* 107 Ga. 330, 333 (33 SE 62); *Arnold v. Johnston,* 84 Ga. App. 138 (65 SE2d 707); *Jones v. Darling,* 94 Ga. App. 641 (95 SE2d 709).

I do not find paragraph 8 ambiguous when construed with paragraph 7. I disagree with the statement in the majority opinion that there are only two kinds of compensation dealt with in the contract. There are actually three kinds. Paragraph 7 assures McIntyre, in case of severance, of receiving "the proportionate amount of his stipulated salary *then due, computed*

*on a monthly basis."* The remaining compensations are (1) salary not yet earned for the remainder of the year, and (2) bonus. Paragraph 8 contains a covenant not to sue as to both of these amounts. The wording of paragraph 8, "the provisions made herein, *including* bonus," convinces me that the parties were thinking in the plural and not in the singular. Otherwise they would have said "the provision for bonus" or something like that. If it be conceded that paragraph 8 is unambiguous in referring to bonus *and something else,* it refers to bonus and unearned salary, the compensation which is not dealt with in paragraph 7 referring to earned salary. The covenant not to sue goes to both these items.[1] It was a most unusual contract from McIntyre's standpoint, but I assume that he was laboring under no disabilities and is bound by his commitment. He was a man capable of earning $1,000 a month as an assistant to a president. His petition alleges a breach of contract, but alleges no facts which would allow him to escape the effect of his covenant not to sue in the event of such breach. In this case I fear that the law is on one side and justice and equity on the other, but I am of the opinion that we should follow the law.

I am authorized to say that Carlisle, P. J., Bell and Hall, JJ., join me in this dissent.

### On Rehearing.

Felton, Chief Judge, concurring specially in the ruling in Division 2 of the opinion.

The contract involved in this case is as follows: "Georgia, Fulton County—This agreement, made as this first day of December, 1960 by and between Zac-Lac Paint & Lacquer Co., a corporation of the State of Georgia, and E. Fred McIntyre, Jr.—Witnesseth—Said Zac-Lac Paint & Lacquer Co., *hereinafter referred to as the corporation,* does employ E. Fred McIntyre, Jr. as administrative assistant to the president, for the period of *one year,* from and after the first day of December, 1960, and at the expiration of this contract, it may be renewed under conditions and circumstances as may be mutually agreed between both parties.

---

[1]Covenant not to sue is set out in majority opinion.

"1. The corporation, in consideration of the promises, undertakings and agreements of E. Fred McIntyre, Jr., herein contained and as compensation to him for all services rendered and to be rendered hereunder, agrees to pay E. Fred McIntyre, Jr. an annual salary of twelve thousand ($12,000.00) dollars, payable in equal semi-monthly installments of five hundred ($500.00) dollars each, less social security and withholding tax, as provided by law. This contract shall remain in force except for the failure to perform satisfactorily the duties outlined herein.

"2. E. Fred McIntyre, Jr., is to act as administrative assistant to the president performing all duties that would be assigned to him by the president and is accountable to the president of the corporation.

"3. In consideration of the compensation to be paid to him by the corporation, said E. Fred McIntyre, Jr., agrees to devote all of his time, attention and energies to the performance of the duties required of him by virtue of said employment and further agrees that during the continuance of his employment by the corporation, he will not engage in any other business or venture, whether or not such business is competitive or for profit, unless same is specifically approved in advance by the president of the corporation.

"4. A bonus will be paid to E. Fred McIntyre, Jr., by the corporation, based on a percentage of net profits, amount to be determined, after annual audit is completed. Said bonus will be based on the operations of the corporation for the year 1961. No bonus will be paid on the operations of the corporation for the year 1960.

"5. The amount of the net profits (after taxes) of the corporation, if any, upon which the bonus mentioned in the preceding paragraph is based, shall be determined through a proper audit of the books of the corporation by an independent certified public accountant, and the amount so found and determined by such accountant, shall be final and binding upon each of the parties.

"6. No part or portion of the bonus, if any, to be paid to E. Fred McIntyre, Jr., hereunder, shall be due and payable to him until the completion of the audit of the books of the corpo-

ration, by said accountant, following the closing of said books on December thirty-first, which is the ending of the corporation's fiscal year.

"7. In the event of the termination of this contract, whether by death of E. Fred McIntyre, Jr., or by mutual agreement, or otherwise, said E. Fred McIntyre, Jr., shall be entitled to receive the proportionate amount of his stipulated salary then due, computed on a monthly basis.

"8. It is also agreed that the provisions made herein, including bonus arrangement, are voluntary and no suit or action shall be brought against Zac-Lac Paint & Lacquer Co. to recover same, and, in the event E. Fred McIntyre, Jr., severs his connections with the corporation before the close of any fiscal year, that he will not be entitled to receive any sums provided for herein. In witness whereof: Zac-Lac Paint & Lacquer Co. has caused this instrument to be signed by its president and E. Fred McIntyre, Jr., has hereunto set his hand and seal as of the day, the month and the year first above written. /s/ M. E. Zachos, President; E. Fred McIntyre, Jr., Administrative Assistant."

There are inconsistencies, conflicts and ambiguities in the above contract which require consideration by this court in arriving at the meaning and legal effect of the provisions of the contract. While at first blush it might seem that paragraph 8 forecloses all right to sue for any amount, under the contract other considerations override such a view and demand a contrary conclusion: *1st.* There is no binding obligation in the contract for a payment of any definite bonus because no percentage of the net profits is agreed on. This leaves a question of the payment of a bonus and the amount, entirely to the corporation and in the event of the payment of a bonus it would be voluntary payment, without obligation, on the part of the corporation. The same would be true if there were a promise to pay a certain percentage of bonus and it was agreed that such a promise was voluntary and not a consideration. *2nd.* The last sentence in paragraph numbered "1" in the contract contradicts paragraph 8. If a contract is *in force,* an action may be maintained on it. *3rd.* The principle of ejusdem generis applies to paragraph 7. The words "or otherwise" should be

construed to mean the same thing as the specific instances of the causes of the termination of the contract, to wit: causes brought about other than by the misconduct of either party. Under this construction, paragraph 7 is contrary to paragraph 8 if paragraph 8 is construed as on first blush it might be, because a provision that the employee shall be entitled to receive a proportionate amount of his stipulated salary due upon termination is inconsistent with a covenant not to sue. *4th.* In paragraph 8 the statement that the provisions in the contract are voluntary is not true as to all of them. The mutual obligations of the parties, for a consideration, are not voluntary but are ordinarily legally binding. The provision for a bonus payment is voluntary *under the terms of this contract,* and it is my opinion that the contract intended to provide solely that no action could be brought by the employee upon the contract for a proportionate part of a yearly bonus in the event he himself severed connections with the corporation before the close of any fiscal year without any fault on the part of the corporation. I think paragraph 8 should be so construed because without the word "and" appearing after the words "to recover same" the paragraph would undoubtedly mean what has just been stated next above. Moreover, if the first part of paragraph 8 is an immediate release of the corporation for all future indebtedness the addition of the last part of the paragraph was completely superfluous. In view of the ambiguity and contradictions of the contract, I am of the opinion that the parties intended the meaning to be as if said "and" had been omitted. I do not think that the rule as to covenants not to sue applies in this case because of the mutual obligations of the parties agreed to be performed after the execution of the contract and this fact distinguishes this case from some or all of the cases cited on this question. I do not think that it can be said that the employee intended to make any future gift to the corporation. He certainly could not be said to have so intended where the contract provided that he would be entitled to receive salary then due upon termination without fault of either party.

In view of the contradictions and ambiguities in this contract and *Code* § 20-704 (6), I think it is perfectly proper for this

court to give the contract the only reasonable, rational and fair construction of which it is susceptible.

In cases of *unambiguous* contracts resort must be had to reformation. Courts of law have been construing ambiguous contracts from time immemorial and numerous rules have been developed for their construction. The courts have properly recognized the fallibility of lawyers and laymen in the writing of contracts and seek to lend a helping hand in the solution of the problems of ambiguities and conflicts in contracts and go a long way towards giving a contract a construction which is reasonable and fair and not one which is ridiculous and absurd. 12 Am. Jur., Contracts, 749, § 228, 751, § 229, 772, § 241; *Drake v. Wayne*, 52 Ga. App. 654 (184 SE 339).